## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

KEVIN DUANE BOWERS,        )
                                     )
                   Plaintiff,      )
                                     )
v.                             )        Case No. 13-CV-158-GKF-PJC
                                     )
CAROLYN W. COLVIN,         )
Acting Commissioner of the       )
Social Security Administration,     )
                                     )
                  Defendant.    )

## REPORT AND RECOMMENDATION

Claimant, Kevin Duane Bowers, ("Bowers"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Bowers's applications for disability insurance benefits and for supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Bowers appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

### Claimant's Background

At the time of the hearing before the ALJ on August 8, 2012, Bowers was 45 years old. (R. 42, 49). He had graduated from high school, and he had a bachelor's degree from Oklahoma State University. (R. 50). When asked if he did any driving, Bowers said no, but agreed that he drove a motorcycle "every once in a while." *Id.* He said that he had not driven a motorcycle since a February 2012 incident in which he was badly burned by his motorcycle. (R. 50-51).

Bowers had served in the National Guard from 1989 to retirement, with active duty from 1986 to 1989, in 2003, and in 2007-2008. (R. 51-52). He had a disability rating of 60 from the Veterans Administration (the "VA"), but he also had a pending claim for post-traumatic stress disorder ("PTSD"). (R. 54-55). He testified that he had witnessed public hangings in downtown Baghdad when serving in Iraq. (R. 57).

Bowers testified that he had problems with nightmares every night. (R. 60). He thought he was able to sleep about two to three hours in each 24-hour period, which included "catnaps" during the day. (R. 60-61). He said the lack of sleep made him sleepy all the time and affected his ability to focus and concentrate. *Id.* He said that other than trying to sleep, he could not do anything. (R. 61). He did a lot of reading on his computer, and he usually reread items to understand them. (R. 62-63). Bowers testified that he was depressed and thought about suicide "all the time." (R. 63).

Bowers agreed with the ALJ that he rented a private airplane and flew it regularly in order to keep up his ratings current. (R. 66-67). Bowers testified that he always took someone with him when he flew. (R. 67).

Bowers testified that he had problems with hammer toes, and it would take him 20 minutes to walk half a mile because he would need to rest. (R. 64). He said that his feet hurt all the time. (R. 67). He had the problem with his feet for a long time, but he thought the problem had gotten worse since 2006. (R. 68). He testified that he elevated his feet for about six or seven hours a day. (R. 68-69). Bowers said that he had headaches "about every day," and he said that they lasted for about four or five hours. (R. 69). He had told his physicians about the headaches, but they had not given him any medication. *Id.* When he had a headache, he would lie down and close his eyes. *Id.* He said that he had ringing in his ears all the time, and it interfered with his

ability to hear.  (R. 70).  He had episodes of dizziness, sweating, and feeling sick about once or twice a week.  (R. 70-71).  He said that he vomited during every one of these episodes.  (R. 71).  Bowers testified that part of his VA disability rating was due to his vision.  (R. 71).  He had cataract surgery in 2008, but he still had problems with his vision.  (R. 71-72).

VA records reflect that Bowers was treated for complaints of bad eyesight from 2009 through 2012.  (305-10, 369-77, 379-84, 464-66, 570-73, 597-606, 728-31, 745-53).

Bowers presented to a VA clinic on July 27, 2010 with a complaint of severe migraines that had been ongoing for 3-4 weeks.  (R. 355-68).  Screens for PTSD and depression completed during this appointment were positive.  *Id.*  Bowers was prescribed diclofenac and methocarbamol.  (R. 357).  A CT scan of Bowers's head on August 30, 2010 was unremarkable.  (R. 390).  During an appointment with a primary care physician at the VA on November 16, 2010, Bowers said that he had daily headaches for 2-3 hours.  (R. 335).

Bowers was given a suicide prevention risk assessment screening at the VA by Emmanuel J. Roman, M.D. on November 29, 2011.  (R. 589-97).  On Axis I,[1] Dr. Roman assessed major depressive disorder, recurrent, with psychotic features; and a note to rule out

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation."  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

PTSD.  (R. 593).  He assessed Bowers's Global Assessment of Functioning ("GAF")[2] as 50.  *Id.*
He started prescription medications.  *Id.*

Bowers presented at the VA for an annual examination on December 14, 2011.  (R. 455-
61).  He complained of daily headaches.  (R. 456).  He stated that he had experienced head
trauma from an improvised explosive device ("IED") attack in Iraq in 2008 and in a motorcycle
accident in 2009.  *Id.*  He said that he did not sleep at night and that he experienced visual and
auditory hallucinations.  *Id.*  He said that his toes hurt all the time.  *Id.*  He reported vomiting
after every meal and experiencing constant diarrhea.  *Id.*  Assessments included headache and
major depressive disorder, recurrent, severe, with psychotic features.  (R. 456-57).

Bowers was seen at the VA for mental health concerns on December 20, 2011.  (R. 583-
85).  Bowers presented to the VA for a comprehensive psychiatric evaluation on December 23,
2011, which was completed by River J. Smith, Ph.D.  (R. 577-83).  Dr. Smith made Axis I
diagnoses of major depressive disorder, severe; and PTSD.  (R. 582).  Bowers presented for
mental health care at the VA on January 5, 2012 and was seen by Dennis Trost, M.D.  (R. 573-
76).  Axis I diagnoses were major depressive disorder, severe; and PTSD.  (R. 575).  Bowers's
GAF was assessed as 45-50.  *Id.*  His medications were adjusted.  *Id.*  Bowers was seen by a

---

[2] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at
32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of
the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100. A GAF
score between 21-30 represents "behavior is considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment . . . or inability to function
in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality
testing or communication . . . or major impairment in several areas, such as work or school,
family relations, judgment, thinking, or mood." *Id.*  A GAF score of 41-50 reflects "serious
symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

physician's assistant at the VA for follow-up mental health care on February 27, 2012, and his medications were adjusted.  (R. 568-70).

Bowers received extensive treatment, including surgery, at the VA for a third-degree burn to his right inner calf from a motorcycle muffler in February 2012.  (R. 507, 520-37, 541-68, 624-27, 650-90, 694-726, 728).  Bowers reported that his motorcycle fell on him in his garage and burned his leg for about 20 minutes before others were able to remove the motorcycle.  (R. 566-67).  He said that he had been drinking before the incident.  *Id.*

Bowers was seen by Dr. Trost on March 22, 2012.  (R. 537-40).  Bowers had been off of his mental health medications since the time of the February leg burn.  (R. 537).  An Axis I diagnosis was major depressive disorder, severe, with a note that it was in poor control without medications.  (R. 539).  PTSD was also included on Axis I.  Bowers's GAF was assessed as 45-50.  (R. 540).  He was started again on prescription medications.  *Id.*  Bowers was seen by Dr. Trost on June 22, 2012, and his severe major depressive disorder was noted as having improving symptoms.  (R. 647-50).  PTSD was still listed as a diagnosis on Axis I.  (R. 649).  Bowers's medications were adjusted.  *Id.*

Bowers attended a psychiatric evaluation arranged by his attorneys with Grant Ward, Ph.D. on August 1, 2012.  (R. 757-71).  Dr. Ward completed an Impairment Questionnaire and a 5-page narrative report dated August 7, 2012.  *Id.*  Bowers described himself as "retired military," said he had no desire to work, said he preferred to ride his motorcycle and help his friends with their motorcycles, and acknowledged that he was willing to perform carpentry work when he was able.  (R. 767).  Bowers said that he had earned a bachelor's degree in aviation while in the military and that he flew a rented plane once a month to keep his ratings current.  *Id.*  Bowers reported that he received mental health treatment from the VA and said that he flushed

his prescription medications down the toilet.  (R. 770).  Dr. Ward said that the examination had

resulted in evidence that fully supported the presence of PTSD.  (R. 771).  He said that Bowers's

PTSD symptoms caused him "to have interpersonal dysfunction" and that Bowers was disabled

by his anxieties.  *Id.*  Dr. Ward did not believe that Bowers met the criteria for depression.  *Id.*

> In summary, Mr. Bowers was found to have mental health conditions that impair
> his ability to interact with the general public, cause him to experience a great deal
> of anxiety when he has feelings of loss of control, and make him a risk to the
> safety of others if his hypervigilance is triggered by their appearance and/or
> behavior.

*Id.*  Dr. Ward thought that Bowers could manage his own funds.  His diagnostic impressions on

Axis I were nicotine dependence, acute; PTSD; and depressive disorder not otherwise specified.

*Id.*  Dr. Ward scored Bowers's GAF as 58, and he said that Bowers's prognosis was guarded if he

took no medication and did not receive psychotherapeutic treatments.  *Id.*

On the impairment questionnaire, Dr. Ward indicated that Bowers was markedly limited

in four areas:  his ability to work in coordination with others without being distracted by them,

his ability to interact appropriately with the general public, his ability to accept instructions and

respond appropriately to criticism from supervisors, and his ability to get along with co-workers

without distracting them or exhibiting behavioral extremes.  (R. 761-62).  He found that Bowers

was moderately limited in four areas and mildly limited in four areas.  (R. 760-63).  He found no

evidence of limitation in eight areas.  *Id.*  Dr. Ward said that Bowers was capable of tolerating

low-stress work.  (R. 764).  Dr. Ward wrote that Bowers was likely not capable of a 40-hour

work week especially if interaction with others was required.  (R. 765).

Agency examining consultant Michael D. Morgan, Psy.D. conducted a mental status

examination of Bowers on July 20, 2011.  (R. 413-18).  Bowers told Dr. Morgan that 25 years in

the Army was his most noteworthy type of employment, and that his problems began to interfere

6

with his ability to work in 2005.  (R. 413).  Dr. Morgan found that Bowers's legal history and his

personal history were consistent with alcohol dependence.  (R. 415).  Dr. Morgan's opinion was

that Bowers met the criteria for a recurrent major depressive disorder and for PTSD, and he

included those on his Axis I diagnostic impressions, along with alcohol dependence.  (R. 415-

16).  Dr. Morgan scored Bowers's GAF as 56-60.  (R. 416).

On August 6, 2011, non-examining agency consultant Ron Cummings, Ph.D., completed

a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment.

(R. 419-36).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Cummings

indicated that Bowers had recurrent, moderate, major depressive disorder pursuant to Dr.

Morgan's report.  (R. 426).  For Listing 12.06, Dr. Cummings indicated that Bowers had anxiety

evidenced by recurrent and intrusive recollections of a traumatic experience.  (R. 428).  For the

"Paragraph B Criteria,"[3] Dr. Cummings said that Bowers had mild restriction of activities of

daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 433).

In the "Consultant's Notes" portion of the form, Dr. Cummings summarized Dr. Morgan's

report.  (R. 435).  He noted Bowers's activities of daily living as described on his function report

and on a form completed by his father.  *Id.*

---

[3] There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment.  The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

In Dr. Cummings's Mental Residual Functional Capacity Assessment, he found that Bowers had marked limitations in his ability to understand, remember, and carry out detailed instructions and in his ability to interact appropriately with the public. (R. 419-20). He wrote that Bowers was able to maintain concentration, persistence and pace for a normal work day and work week. (R. 421). Bowers was able to understand and carry out simple and some complex tasks. *Id.* He was able to recognize and avoid common work hazards, and he was able to adapt to changes in the work setting and to make decisions regarding work tasks. *Id.* Bowers was able to work with co-workers and supervisors on a superficial basis without being overly distracted by psychological symptoms. *Id.* Bowers was not able to work effectively with the general public due to mood instability. *Id.*

Agency consultant Bhupinder Walia, M.D. completed a physical examination and report dated April 30, 2011. (R. 399-404). Bowers said that he had pain in both legs from his knees to his toes. (R. 399). He also reported constant fatigue. *Id.* Dr. Walia's physical examination and findings were normal, and his assessment was chronic leg pain. (R. 400-04).

A Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Kenneth Wainner on June 14, 2011. (R. 405-12). For exertional limitations, Dr. Wainner found that Bowers was capable of medium work. (R. 406). For narrative explanation, Dr. Wainner briefly summarized Dr. Walia's report. (R. 406-07). Dr. Wainner found no other limitations. (R. 407-09).

## Procedural History

Bowers filed his applications in February 2011. (R. 169-77). The applications were denied initially and on reconsideration. (R. 97-105, 115-20). An administrative hearing was held before ALJ David W. Engel on August 8, 2012. (R. 42-90). By decision dated August 24,

2012, the ALJ found that Bowers was not disabled.  (R. 12-28).  On January 16, 2013, the

Appeals Council denied review.  (R. 1-5).  Thus, the decision of the ALJ represents the

Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[4]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Bowers met insured status requirements through December 31, 2014. (R. 15). At Step One, the ALJ found that Bowers had not engaged in any substantial gainful activity since his alleged onset date of September 24, 2009. *Id.* At Step Two, the ALJ found that Bowers had severe impairments of service connected military disabilities and allied disorders. *Id.* At Step Three, the ALJ found that Bowers's impairments did not meet any Listing. (R. 16-17).

The ALJ found that Bowers had the RFC to perform a range of light and sedentary work. (R. 17). The ALJ said that Bowers could not climb ropes, ladders, or scaffolds, and was unable to work in environments where he would be exposed to unprotected heights and dangerous moving machinery. *Id.* He said that Bowers could understand, remember, and carry out simple to moderately detailed instructions in a work-related setting and could interact with co-workers and

supervisors under routine supervision.  *Id.*  At Step Four, the ALJ determined that Bowers had no

past relevant work.  (R. 26).  At Step Five, the ALJ found that there were a significant number of

jobs in the national economy that Bowers could perform, taking into account his age, education,

work experience, and RFC.  (R. 26-28).  Therefore, the ALJ found that Bowers was not disabled

at any time from September 24, 2009 through the date of his decision.  (R. 28).

## Review

Bowers asserts three arguments in his appeal of the ALJ's decision.  First, he states that

the ALJ failed to properly weigh the reports of Dr. Ward and the agency consultants.  Plaintiff's

Opening Brief, Dkt. #15, pp. 6-10.  Second, he faults the ALJ's credibility assessment.  *Id.*, pp.

11-13.  Third, he asserts that the hypothetical question to the vocational expert (the "VE") failed

to include all impairments and thus the VE's testimony can not constitute substantial evidence to

support the ALJ's Step Five decision.  *Id.*, pp. 13-15.  In reviewing the issues raised by Bowers,

the undersigned recommends that this case be affirmed because the ALJ's decision was supported

by substantial evidence and complied with legal requirements.

## Opinion Evidence

Bowers's first argument is limited to the evidence of the mental health examining and

nonexamining consultants.  Regarding opinion evidence, generally the opinion of a treating

physician is given more weight than that of an examining consultant, and the opinion of a

nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084

(10th Cir. 2004).

In a recent case, the Tenth Circuit rejected an argument that the ALJ had not sufficiently

discussed treating physician opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not
> adequately evaluate and discuss the medical-source evidence.  Where, as here, we
> can follow the adjudicator's reasoning in conducting our review, and can determine
> that correct legal standards have been applied, merely technical omissions in the
> ALJ's reasoning do not dictate reversal.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).  The court also said that

"common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more

comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical

perfection."  *Id,* at 1166; *see also Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009)

(unpublished) (while "it would have been helpful if the ALJ had elaborated" on his analysis of

opinion evidence, the ALJ's decision was adequate).

Here, the ALJ said he gave "great weight" to the opinions of the agency examining and

nonexamining consultants.  (R. 26).  The opinions of those consultants were substantial evidence

that the ALJ was entitled to rely upon.  *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir.

2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was

entitled to consider and which supported his RFC determination); *Leach v. Astrue*, 470 Fed.

Appx. 701, 704 (10th Cir. 2012) (unpublished) (ALJ's RFC determination was supported by

substantial evidence when it was based in part on reports of both examining and nonexamining

consultants).

The question then, is whether the ALJ gave legitimate reasons for the "little weight" that

he assigned to the opinion of Dr. Ward, who examined Bowers once at the request of Bowers's

disability attorneys.  (R. 26).  The ALJ focused primarily on the fact that Dr. Ward was

presumably paid for his opinion and that his examination of Bowers was completed as part of an

effort to "generate evidence." *Id.*  The parties cite to Eighth Circuit and other noncontrolling authorities regarding whether it is proper to discount a paid expert's opinion based solely on the fact that the expert is paid by the claimant.  The undersigned finds the preferable route under the circumstances of this case is to find that the ALJ had additional legitimate reasons for discounting the opinion of Dr. Ward.  While it would have been preferable for the ALJ to explain more clearly his reasons for giving Dr. Ward's opinion evidence little weight, the common sense interpretation of the ALJ's analysis of Dr. Ward's evidence is that the ALJ found statements that Bowers made to Dr. Ward to be untruthful and that therefore he viewed the conclusions that Dr. Ward made as invalid because they were based on the untruthful information Bowers gave him.

This reviewer is able to follow the ALJ's reasoning by reviewing the comprehensive summary he gave of the evidence.  For example, the ALJ reviewed Bowers's testimony at the hearing that he had completed one tour of duty in Iraq, while he had told Dr. Morgan (the agency examining consultant) that he had served three tours in Iraq.  (R. 18).  It is understandable that the ALJ would have questioned the accuracy of information Bowers gave Dr. Ward when the ALJ found specific examples of untruthful information that Bowers gave Dr. Morgan.  Further, the ALJ pointed out that Dr. Ward included in his report that Bowers said he "had no desire to work," and that, at the hearing, Bowers said that he would "love to work," with no explanation for the inconsistent statements.  (R. 19).  The ALJ reported multiple other inconsistencies in statements that Bowers made to different health professionals, as well as the examining physicians.  (R. 18-26).  It is evident that the ALJ found Bowers to be not credible and that therefore his interview with Dr. Ward was of questionable accuracy.  *Id.*

The Commissioner correctly points out that virtually every paragraph of Dr. Ward's report starts with the statement "Mr. Bowers reported," making clear that Dr. Ward's opinion evidence

was based solely on the subjective statements that Bowers made to him.  While the report, under

the heading of "Techniques," states that Dr. Ward reviewed "documentation," Dr. Ward made no

references in his report to any VA or other health records.  (R. 767-71).  Thus, while Bowers

asserts that Dr. Ward indicated that he had reviewed the underlying treatment records, the lack of

any reference to them indicates otherwise.  The ALJ was entitled to discount Dr. Ward's opinion

evidence because it appeared to be solely based on Bowers's subjective complaints, and the ALJ

made a supported credibility assessment that Bowers had reduced credibility.  *White v. Barnhart*,

287 F.3d 903, 908-09 (10th Cir. 2001) (affirming ALJ's discounting of opinion when based in

part on ALJ's finding that physician relied heavily on subjective assertions of pain); *Butler v.

Astrue*, 410 Fed. Appx. 137, 142-43 (10th Cir. 2011) (unpublished) (when examining physician's

report was based on claimant's subjective complaints of pain, ALJ's decision to discount opinion

based on his evaluation of the claimant's credibility was not reversible error).

       Bowers also complains that the ALJ did not include all limitations found by the mental

health physicians in his RFC and in the hypothetical question proffered to the VE.  The

undersigned agrees, but finds that the omission of a limitation of Bowers's ability to interact with

the public is not reversible error in this case.

       An ALJ is not allowed to include some limitations found by consultants in his RFC

determination and to omit other limitations without explanation.  *Haga v. Astrue*, 482 F.3d 1205,

1207 (10th Cir. 2007).  Here, Dr. Cummings found that Bowers had a marked limitation in his

ability to interact with the general public.  (R. 420-21).  Without explanation, the ALJ did not

include a corresponding limitation in his RFC.  (R. 17).  This appears, however, to have been an

oversight on the part of the ALJ because his hypothetical to the VE did include "only occasional"

interaction with the public.  (R. 80-81).  All of the jobs identified by the VE in response to this

hypothetical and used by the ALJ in finding Bowers not disabled at Step Five did not require

interaction with the public or substantial interaction with co-workers or supervisors.  Bagger,

DOT 582.687-010, 1991 WL 684303; product wrapper, DOT 524.687-018, 1991 WL 674400;

table worker, DOT 739.687-182, 1991 WL 680217; inspector, DOT 713.687-018, 1991 WL

679271; final assembler, DOT 737.687-122, 1991 WL 680071.  Under these circumstances, the

failure of the ALJ to include an explicit limitation of no interaction with the general public in his

RFC determination was not reversible error.  The jobs identified by the VE continued to be

substantial evidence that supported the ALJ's Step Five decision.

The ALJ did not commit reversible error in discounting the opinion evidence of Dr. Ward

or in omitting a limitation on interaction with the general public in his RFC determination.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities
> of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910.  In evaluating credibility, an ALJ must give specific reasons that are

closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995);

Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon sense, not technical perfection, is

[the] guide" of a reviewing court.  *Keyes-Zachary*, 695 F.3d at 1167.

At the outset, the undersigned notes that the ALJ's credibility assessment included many

boilerplate provisions.  (R. 24-25).  Boilerplate language is disfavored because it fails to inform

the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ

considered."  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).  However, boilerplate

language is "problematic only when it appears 'in the absence of a more thorough analysis.'"

*Keyes-Zachary,* 695 F.3d at 1170 (quoting *Hardman*).  Here, the undersigned ignores the

boilerplate language that the ALJ used and reviews the "more thorough analysis" that the ALJ

provided.

A reviewer has no difficulty in finding substantial evidence linked to specific reasons

supporting the ALJ's finding that Bowers was less than fully credible.  The ALJ noted suspect

statements by Bowers throughout his decision, including inconsistent statements regarding the

number of tours of duty he served in Iraq and regarding his desire to work, as mentioned above.

(R. 18-25).  Pointing out inconsistencies in the claimant's statements is obviously a specific

reason that supports a finding of reduced credibility.  *Harris v. Astrue*, 2012 WL 3893128 at *4

(10th Cir.) (unpublished), *citing* SSR 96-7p, 1996 WL 374186 at *5.  Other examples given by

the ALJ included that Bowers stated that he had engaged in numerous combat operations in Iraq,

but he also stated that his feet hurt during that service in the military and that the pain was part of

his disability claim.  (R. 18).  The ALJ noted that Bowers's testimony regarding his vision

appeared to be contradictory because he said that he did not drive a car, but that he had driven his

motorcycle until the February 2012 burn incident, and that he flew a rented plane every month in

order to keep his pilot rating.  (R. 19).  The ALJ noted that Bowers told medical personnel,

inaccurately, that he had suffered a traumatic brain injury from an IED explosion during his

service in Iraq.  (R. 21).  All of these examples are substantial evidence that supports the ALJ's

credibility assessment.

Bowers complains that the ALJ was inconsistent in the part of his credibility assessment

that addressed Bowers's activities of daily living.  Plaintiff's Opening Brief, Dkt. #15, p. 12.

Bowers asserts that "limited daily activities do not establish an ability to work." *Id.*  The ALJ's

point, however, was that Bowers's activities did not indicate the degree of limitation that one

would expect in someone who was totally disabled.  (R. 24).  For example, in addition to activities

of personal hygiene and household chores, Bowers engaged in hanging out with his friends and

riding motorcycles, helping his friends with their motorcycles, hunting, doing carpentry work, and

participating in veterans groups.  *Id.*  All of these activities go beyond "limited daily activities"

and the ALJ was entitled to consider that they undermined Bowers's claim that he was so disabled

that he could not work.

The ALJ made a credibility assessment that was supported by substantial evidence and that

complied with legal requirements.

**Limitations related to the Paragraph B Criteria**

Bowers argues that the ALJ's RFC, and therefore his hypothetical to the VE, did not

sufficiently address his Paragraph B Criteria findings of "moderate" difficulties in social

functioning and in concentration, persistence, or pace.  Plaintiff's Opening Brief, Dkt. #15, pp.

14-15.  The Tenth Circuit recently disposed of Bowers's argument.  *Lull v. Colvin*, 2013 WL

4828141 *2 (10th Cir.).  In *Lull*, the Tenth Circuit discussed the claimant's argument that the ALJ

erred when he used inconsistent findings of the consulting physicians who found the claimant to

have a "moderate" ability to maintain concentration, persistence, or pace on the Psychiatric

Review Technique form, but who then found she had no significant limitation for the mental

function of "ability to maintain attention and concentration for extended periods" on the Mental

Residual Functional Capacity Assessment.  The Tenth Circuit explained the differences between

the two forms and found that the claimant's argument that the ALJ erred in using in his RFC the

specific limitations found on the Mental Residual Functional Capacity Assessment was "without

merit."  *Id.*  Bowers's argument here is similarly without merit.  The ALJ was not required to find

additional mental impairments and to include them in Bowers's RFC due to his Paragraph B Criteria findings.

## Conclusion

Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by January 16, 2014. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 2nd day of January 2014.

Paul J. Cleary
United States Magistrate Judge